1

2

3

4

5

6                    **UNITED STATES DISTRICT COURT**

7                          **DISTRICT OF NEVADA**

8

9    GREGORY LEONARD,                    )

10                    Petitioner,        )        2:03-cv-1293-LRH-RJJ
                                         )
11   vs.                                 )
                                         )        **ORDER**
12   E.K. McDANIEL, *et al.*,            )
                                         )
13                    Respondents.       )
     ──────────────────────────────────/

14

15   I.      Introduction

16          In this capital habeas corpus action, on October 13, 2005,  the petitioner filed a

17   Motion for Leave to Conduct Discovery (docket #29).  On December 14, 2005, the parties filed a

18   stipulation, stating that respondents do not oppose petitioner's discovery motion, and that the motion

19   may be granted in its entirety (docket #30).  That motion and stipulation are before the Court.

20   II.     Background

21          In 1997, petitioner was convicted of a 1994 robbery and murder, and was sentenced to

22   death for the murder.  His direct appeal to the Nevada Supreme Court and his state-court habeas

23   corpus proceedings were unsuccessful.  In 2003, petitioner initiated this federal habeas corpus action.

24   In its opinion on petitioner's direct appeal, affirming petitioner's conviction and sentence, the

25

26

Nevada Supreme Court set forth the facts of the case as follows:[1]

Appellant Gregory N. Leonard worked as maintenance supervisor at the Mark Twain Apartments in Las Vegas. He lived in a small apartment next to the maintenance shop. The victim in this case, Thomas Benjamin Williams, was a tenant in the same apartment complex. Williams and appellant, occasional drinking companions, became involved in a dispute over a $3,548.00 poker machine jackpot. On November 25, 1994, the evening before the night Williams was killed, a bartender separated the two during a loud argument over the winnings.

Williams and Phyllis Fineberg, a reputed prostitute, were engaged to be married. On November 25, 1994, Fineberg borrowed Williams' car for about one-half hour, but did not return it for several hours. When she returned, the couple argued. Fineberg left Williams' apartment and went to the apartment of her friend Lynn Spencer in the same complex. Shortly thereafter, Williams called Spencer's apartment, told Fineberg he was going across the street to P.T.'s Pub for a drink, and went to the pub.

Ten to fifteen minutes later, Fineberg appeared at the pub but did not sit with Williams. Fineberg won a $200.00 poker jackpot and slipped the money into Williams' shirt pocket. About one-half hour later, Fineberg left the pub and returned to Spencer's apartment.

Later that night, at around 12:15 a.m., Fineberg returned to the pub. She approached Williams, who was sitting at the bar between Frank Deschene and appellant. Williams was intoxicated, and the bartenders, Kassey Leonard and Albert Garkow, had stopped serving him alcohol. Williams and Fineberg argued. Garkow tried to separate them because their argument was disturbing other customers. According to Garkow, Williams had pretty much broken off his relationship with Fineberg. At one point, Fineberg told Garkow to keep Williams away from her or she was "gonna kill him." At trial, Fineberg denied saying this. Fineberg reached into Williams' shirt pocket and retrieved the money she had placed there earlier that evening.

Fineberg returned to the bank of poker machines. Appellant approached her and asked her to return the money she had taken from Williams' pocket. Fineberg refused, and appellant sat back down next to Williams.

Garkow asked Deschene and appellant to help Williams across the street to his apartment because he felt Williams was too drunk to walk alone. Fineberg was not comfortable with this arrangement and followed them to Williams' apartment. Fineberg saw Deschene walk Williams across the street. After Williams opened the door to his apartment, Fineberg asked Deschene to leave. Deschene refused, and Fineberg called 911. Thereafter, when appellant arrived at the apartment, Fineberg again called 911. Deschene and appellant

---

[1]   The Court sets forth the facts, as stated by the Nevada Supreme Court, only to provide background for this discovery order. The Court does not intend to make any finding regarding any of the facts stated in this section of this order.

1    then left the area.

2         Williams and Fineberg continued to argue for a few minutes.  As
     Fineberg was leaving, she encountered a police officer responding to her 911
3    calls.  At Williams' request, the officer patted down Fineberg and confirmed
     that she had no key to the apartment.

4
          Fineberg spent the night at Spencer's apartment and called Williams
5    the next morning.  When Williams did not answer, she proceeded back to his
     apartment.  Upon arrival, she noticed that the heater was not on and that the
6    door was unlocked.  Fineberg then entered the apartment and found Williams
     lying on the floor, wearing the same clothes as the night before.  Fineberg
7    returned to Spencer's apartment, dialed 911 and reported the death.

8         The police found Williams' body lying face up on the floor.  Initially,
     the officers believed that Williams had died of natural causes and began
9    processing the body and death scene as a natural death.  After a mortuary
     attendant discovered a ligature mark around Williams' neck, the police called
10   homicide detectives and secured the scene.

11        There were no initial suspects, no signs of forced entry into the
     apartment, and no suspicious fingerprints.  There was a contusion consistent
12   with blunt force trauma on Williams' left scalp.  The position of the contusion
     was indicative of a blow to the head, not a fall.  A ligature had been wrapped
13   around his neck several times.

14        An autopsy revealed signs of death by asphyxiation, including a
     fractured bone in Williams' neck.  Dr. Robert Jordan, who performed the
15   autopsy, concluded that the cause of death was asphyxia due to ligature
     strangulation and the manner of death was homicide.  Dr. Jordan
16   estimated that Williams was killed between 1:00 a.m. and 9:45 a.m.
     on November 26, 1994.

17
          A few days later, Williams' son, Doug Williams, arrived from Texas
18   to retrieve his father's belongings.  Appellant and Jesus Cintron, another
     maintenance worker at the Mark Twain Apartments, let him into Williams'
19   apartment and helped him move things.  Doug Williams gave appellant and
     Cintron some of Williams' furniture and possessions.

20
          After returning to Texas and inventorying his father's possessions,
21   Doug Williams noticed that some of his father's jewelry and guns were
     missing.  He informed the Las Vegas Metropolitan Police Department.  Later,
22   after being notified of the jackpot dispute between appellant and Williams,
     Detective Michael J. Bryant of the Las Vegas Metropolitan Police Department
23   ran appellant's name on the pawn shop data base.  Detective Bryant
     discovered that appellant had pawned two rings, a Remington shotgun and a
24   video camera which belonged to Williams.

25        On December 30, 1994, Detective Bryant interviewed appellant.
     When asked about the night Williams died, appellant told the detective he had
26   socialized with Williams at the pub.  The last time appellant saw Williams
     was at Williams' apartment door.  Williams was with a woman and another

3

man. When asked if he had received any property from Williams, appellant said that Williams' son had given him "some stuff." A search, pursuant to a search warrant, of appellant's apartment on January 4, 1995, revealed several boxes of ammunition that fit Williams' guns.

According to Cintron, appellant had keys to every apartment in the complex. At trial, appellant denied having a key to Williams' apartment, and said he had purchased the pawned rings and shotgun from strangers on the street.

On January 22, 1995, appellant paged Cintron and asked Cintron to come and help him "or else ten more people [sic] going to die." Cintron called appellant's pager. Appellant returned the call. Cintron recognized appellant's voice, and Cintron's caller I.D. indicated Mark Twain Apartments, where appellant used the telephone in the maintenance shop. When Cintron refused to come and help, appellant said he would kill Cintron and several other people. Appellant also told Cintron that he "did [Williams] too."

Cintron reported this conversation to the police. Cintron brought his beeper to a police station and played appellant's message for the police officers. After listening to the message several times the officers returned the beeper to Cintron without recording the message.

On January 23, 1995, as a result of Cintron's report, the police obtained another search warrant and again searched appellant's apartment. They found pawn shop receipts in a wallet belonging to Jerry Leonard, appellant's cousin. The receipts were for a diamond ring that had been pawned by Jerry Leonard on November 30, 1994.

When Detective Bryant asked appellant about the pawned items and the ammunition found in his apartment, appellant said he had purchased the items on the street. It is known to the police that people often sold stolen goods on the street where appellant lived.

The police arrested appellant. He was charged with one count each of first degree murder, robbery and burglary. The jury found appellant guilty of one count each of first degree murder and robbery.

*Leonard v. State*, 114 Nev. 1196, 969 P.2d 288, 291-93 (1998) (footnote omitted).

Following his unsuccessful direct appeal and state habeas proceedings, petitioner initiated this federal habeas corpus action on October 15, 2003. The petition for a writ of habeas corpus (docket #7) was filed on January 5, 2004, after the matters of petitioner's *in forma pauperis* status and his payment of the filing fee were resolved. Counsel was appointed for petitioner (*see* docket #6, #11, and #13).

On September 30, 2005, petitioner filed the Motion for Leave to Conduct Discovery

4

(docket #29) that is now before the Court, along with eight volumes of exhibits (docket #30 - #37).[2] On December 12, 2005, the parties filed the stipulation (docket #38) in which respondents stipulate to the granting of petitioner's discovery motion.

III.     Standards Governing Discovery in Habeas Corpus Actions

Rule 6 of the Rules Governing Section 2254 Cases in the United States District Courts states: "A party shall be entitled to invoke the processes of discovery available under the Federal Rules of Civil Procedure if, and to the extent that, the judge in the exercise of his discretion and for good cause shown grants leave to do so, but not otherwise."

The Supreme Court has construed Rule 6, holding that if through "specific allegations before the court," the petitioner can "show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is ... entitled to relief, it is the duty of the court to provide the necessary facilities and procedures for an adequate inquiry." *Bracy v. Gramley*, 520 U.S. 899, 908-09 (1997) (quoting *Harris v. Nelson*, 394 U.S. 286,  300 (1969)).

The Ninth Circuit Court of Appeals has pointed out that "[a] habeas petitioner does not enjoy the presumptive entitlement to discovery of a traditional civil litigant."  *Rich v. Calderon*, 187 F.3d 1064, 1068 (9th Cir. 1999) (citing *Bracy*, 520 U.S. at 903-05).  "Rather, discovery is available only in the discretion of the court and for good cause shown...." *Id*.  The court instructed:

> Habeas is an important safeguard whose goal is to correct real and obvious wrongs.  It was never meant to be a fishing expedition for habeas petitioners to "explore their case in search of its existence."

*Rich*, 187 F.3d at 1067.

In exercising its discretion with respect to the question whether there is good cause for discovery, within the meaning of Rule 6 and *Bracy*, the Court takes into consideration whether the claims upon which the petitioner wishes to conduct discovery are exhausted in state court.

---

[2] In this order, the exhibits referred to in the form "Exhibit 1" are the exhibits filed by petitioner in support of his discovery motion and found in the record at docket #30 - #37.  The exhibits referred to in the form "Exhibit A to Petition" are the exhibits filed by petitioner in support of his Petition for Writ of Habeas Corpus and found in the record at docket #7.

1   This is because habeas corpus relief usually cannot be granted upon unexhausted claims.  *See*

2   28 U.S.C. § 2254(b).

3            In *Calderon v. United States District Court* (*Hill*), 120 F.3d 927 (9th Cir. 1997), and

4   *Calderon v. United States District Court* (*Nicolaus*), 98 F.3d 1102 (9th Cir. 1996), *cert. denied*,

5   520 U.S. 1233 (1997), the court of appeals granted writs of mandamus preventing discovery in

6   federal habeas cases.  In each case, the petitioner sought, and the district court granted, discovery

7   before the petitioner had filed an exhausted petition.  The court of appeals vacated the discovery

8   orders, and prohibited discovery until the petitioners filed petitions presenting exhausted claims.

9   *See Hill*, 120 F.3d at 928; *Nicolaus*, 98 F.3d at 1106-08.

10           In *Nicolaus*, the petitioner, under sentence of death, maintained that the FBI had not

11  provided him with all the documents relevant to his case, and he sought to obtain some of the

12  allegedly withheld documents through discovery in his federal action.  *See Nicolaus*, 98 F.3d at

13  1104.   The petitioner's claim that the FBI withheld documents was unexhausted in state court, and

14  the court of appeals stressed that he had not sought the requested discovery in state court.  *Id*. at 1104

15  n.1, and 1106-07.  The court ruled that any right to federal discovery requires exhaustion of the claim

16  upon which the discovery is based.  *Id*. at 1106-07.[3]   With respect to this point, the court concluded:

17           In short, if Nicolaus wishes to allege formally that the FBI has
         withheld documents that he believes may tend to exonerate him, he
18         should first bring such an unexhausted claim before the California
         state court.

19

20  *Id*. at 1107.  In a concurring opinion in *Nicolaus*, Chief Judge Schroeder wrote:

21           Of course Nicolaus must first exhaust his claim, along with available
         avenues of discovery, in state court.

22

23  _____

24      [3] There appears to be an unfortunate typographical error in *Nicolaus*.  The opinion, as published,
     states:  "any right to federal discovery presupposes the presentation of an *unexhausted* federal claim,
25   because a federal habeas petitioner is required to exhaust available state remedies as to each of the
     grounds raised in the petition."  *Nicolaus*, 98 F.3d at 1106 (emphasis added).  The tenor of the passage,
26   and its context, reflect that the court meant to highlight the importance of the exhaustion requirement.
     It appears that the court of appeals must have meant to express that any right to federal discovery
     presupposes the presentation of an *exhausted* federal claim.

* * *

Until Nicolaus has filed a federal habeas petition on an
exhausted claim, he cannot avail himself of Rule 6 discovery.

*Id*. at 1109.

In *Hill*, another capital habeas case originating in California, the federal habeas petitioner sought to inspect the files of the Alameda County District Attorney and the Oakland Police Department that pertained to his case. *Hill*, 120 F.3d at 927-28. The district court ordered the discovery, and the respondents sought a writ of mandamus. *Id*. The court of appeals found *Hill* to be indistinguishable from *Nicolaus*. *Id*. at 927. The court issued the writ of mandamus, "[s]ince Hill never presented the district court with a petition for writ of habeas corpus containing an exhausted claim...." *Id*. at 928.

In *Calderon v. United States District Court* (*Roberts*), 113 F.3d 149 (9th Cir. 1997), the court again granted a writ of mandamus, preventing discovery by a federal habeas petitioner. The court stated: "In light of the concession by petitioner that his federal habeas petition contains unexhausted claims that must be dismissed or pursued in state court before they may be included in the federal habeas petition, discovery at this time is inappropriate." *Roberts*, 113 F.3d at 149.

*Hill*, *Nicolaus*, and *Roberts* predated *Bracy*. However, *Bracy* did not undermine the court of appeals' concern that discovery should not proceed upon unexhausted claims; *Bracy* includes no discussion regarding that issue. At the least, *Hill*, *Roberts*, and *Nicolaus* still mandate that this Court, *in exercising its discretion under Rule 6*, should take into consideration whether the claims to which petitioner's proposed discovery relates are exhausted in state court. *See McDaniel v. United States District Court* (*Jones*), 127 F.3d 886 (9th Cir. 1997) (Rymer, J., concurring).

This Court will not grant the wide-ranging discovery sought by petitioner without a showing that he has exhausted in state court the claims on which his proposed discovery might be based. To do so would tend to undermine the exhaustion requirement, and the doctrine of federal-state comity on which it rests. As the Supreme Court stated in *Keeney v. Tamayo-Reyes*, 504 U.S. 1, 9 (1992), *superceded by statute as stated in Williams v. Taylor*, 529 U.S. 362, 432-34 (2000):

7

1  "The state court is the appropriate forum for resolution of factual issues in the first instance, and

2  creating incentives for the deferral of factfinding to later federal-court proceedings can only degrade

3  the accuracy and efficiency of judicial proceedings."

4  IV.   Analysis

5          In his discovery motion, in seeking to justify service of 64 proposed subpoenas,[4]

6  petitioner sets forth 8 distinct sets of claims:[5]  (1) claims related to the pager message that Jesus

7  Cintron claimed to have received from petitioner  (pp. 27-28 of petitioner's motion);

8  (2) claims related to jewelry allegedly pawned at pawn shops (p. 34, footnote 13, of petitioner's

9  motion); (3) claims related to petitioner's allegation that the prosecution failed to disclose evidence

10  regarding contacts with Deborah Shively (p. 30 of petitioner's motion); (4) claims related to

11  petitioner's allegation that his trial counsel was ineffective for failing to investigate and present

12  evidence of Erik Daniel Montoya's involvement in the offense (p. 5, footnote 3, of petitioner's

13  motion); (5) claims related to petitioner's allegation that Phyllis Fineberg engaged in prostitution on

14  the night of Thomas Williams' death (pp. 52-54 of petitioner's motion); (6) claims related to

15  petitioner's allegations that the prosecution failed to comply with its constitutional obligation to

16  disclose exculpatory material regarding witnesses Jesus Cintron and Phyllis Fineberg, and that his

17  counsel was ineffective in failing to adequately investigate those witnesses (pp. 10-45 of petitioner's

18  motion); (7) claims related to petitioner's allegation that there were improper contacts between

19  Phyllis Fineberg and jurors outside the courtroom during the course of his trial (pp. 45-58 of

20  petitioner's motion); and (8) claims related to petitioner's allegation that his trial counsel failed to

21  adequately investigate his background and present mitigating evidence at the penalty phase of his

22  trial (pp. 58-60 of petitioner's motion).

23

24          [4] Petitioner's proposed subpoenas are found at Exhibits 4.1 - 4.66 (docket #34).  However, there
    are no proposed subpoenas at Exhibits 4.14 and 4.15.  Therefore, there are 64 proposed subpoenas to

25  be considered by the Court.

26          [5] Petitioner's motion divides his discovery requests into only three categories.  The Court finds
    that this more detailed breakdown better distinguishes among the different sets of claims described in
    the motion, and better facilitates a complete analysis.

1

2

    A.      Claims Related to the Pager Message that Jesus Cintron Claimed He
              Received from Petitioner

3        Petitioner asserts that his trial counsel was ineffective for failing to make a motion in

4 limine to exclude evidence related to the pager message that Cintron claimed to have received from

5 petitioner. *See* Motion for Leave to Conduct Discovery, pp. 27-28. Petitioner also asserts that his

6 counsel was ineffective for failing to adequately conduct investigation and discovery regarding the

7 pager message. *Id*. Petitioner has included in his petition in this case claims related to these

8 assertions. *See* Petition (docket #7), Grounds 2, 3, and 10. It appears from the record now available

9 to the Court that petitioner has raised before the Nevada Supreme Court, on the appeal from the

10 denial of his state-court habeas petition, a claim that his trial counsel was ineffective for not moving

11 to suppress evidence of the pager message. *See* Exhibit B to Petition.[6]

12        However, in his discovery motion, petitioner does not point to any particular proposed

13 subpoena specifically seeking information regarding the pager message. *See* Motion for Leave to

14 Conduct Discovery, pp. 27-28. Moreover, the Court has examined the proposed subpoenas

15 submitted by petitioner, and can find no proposed subpoena specifically seeking such information.

16 *See* Exhibits 4.1 - 4.66.[7]

17        Because petitioner has not proposed discovery focused on the subject of the pager

18

19

20

---

21      [6] The Court makes this observation in its exercise of its discretion with respect to petitioner's

22 discovery motion. *See* discussion, *supra*, part III. However, the Court does not intend anywhere in this order to make any final ruling with respect to any exhaustion issue. After petitioner completes his discovery and amends his petition, respondents may raise any exhaustion issue in a procedurally

23 appropriate manner, and any such issue will then be resolved based on full briefing by the parties.

24      [7] Obviously, the best practice is for a habeas petitioner, on a discovery motion, to explain the good cause for discovery relative to each proposed subpoenas, or, stated differently, to *explain clearly*

25 *which proposed subpoenas are the subject of which of petitioner's arguments*. The discovery motion before the Court does not do so. Nevertheless, in the interest of avoiding delay, the Court has, where

26 necessary, attempted to determine which of petitioner's proposed subpoenas are subject to which of counsel's arguments, and the Court has considered whether there is a showing of good cause for service of each of petitioner's proposed subpoenas, whether mentioned in the motion or not.

message, the Court will deny petitioner leave to conduct discovery on that subject.[8]

  B.  Claims Related to Pawned Jewelry

Petitioner argues as follows in a footnote of his discovery motion:

> Petitioner should also be allowed to conduct discovery from the pawn shops where Thomas Williams' jewelry was allegedly pawned.  Trial counsel were ineffective in failing to conduct discovery from the pawn shops to determine whether the ring pawned by Mr. Leonard was actually Thomas Williams' ring.  Therefore, petitioner can show good cause to serve the subpoenas attached as Exhibits 4.25, 4.26.

Motion for Leave to Conduct Discovery, p. 34, footnote 13.  In his petition in this case, petitioner makes claims related to the subject of the pawned jewelry.  *See* Petition, Ground 3.  Also, it appears from the record now available to the Court that petitioner made a claim related to the pawned jewelry in his state-court habeas proceedings.  *See* Exhibit B to Petition.

Petitioner points to two of his proposed subpoenas as supported by his claims regarding the pawned jewelry:  Exhibits 4.25 and 4.26.  A close inspection of those proposed subpoenas, however, reveals that they are not supported by the claim that petitioner asserts.

The proposed subpoena at Exhibit 4.25 is addressed to the Custodian of Records of the Tower of Jewels, in Las Vegas, and it orders production of the following materials:

> Any and all records in your files which pertain to any items of jewelry purchased by Thomas Benjamin Williams during October or November of 1994 including, but not limited to, notes pertaining to jewelry selection, sales receipts, repair and/or modification forms, descriptions of the items purchased, photographs of the items purchased, delivery receipts.

Exhibit 4.25, Attachment A.  Petitioner has not provided any explanation, much less good cause, for discovery regarding jewelry *purchased by* Thomas Williams at a pawn shop; rather, the claim asserted as support for this discovery relates to jewelry allegedly owned by Thomas Williams and pawned at a pawn shop.  There is no showing of good cause to support service of the proposed

---

[8]  The Court recognizes that petitioner seeks broad discovery from various police entities concerning himself and Cintron, and that proposed discovery might encompass the subject of the pager message.  As is discussed below, however, the broader discovery is denied because the claims that would support that discovery appear to be unexhausted in state court.  The proposed discovery that might encompass the subject of the pager message is far too broad and general to be justified solely by petitioner's good-cause showing regarding the matter of the pager message.

1    subpoena at Exhibit 4.25.

2            The proposed subpoena at Exhibit 4.26 is addressed to the Custodian of Records of

3    Golden Loans, in Boerne, Texas, or -- inexplicably -- to "person(s) most knowledgeable with regard

4    to official and/or non-official records, documents and materials storage, retention, nature

5    of and content of files of the Classification Section of the Clark County Detention Center."

6    Exhibit 4.26, Attachment A.  It seeks all manner of materials in the possession of the Gold & Silver

7    Pawn Shop regarding petitioner, Jerry L. Leonard, Thomas Benjamin Williams, Tony Darnell Antee,

8    Jesus Cintron, Gladys Felipa Burton, Phyllis Fineberg, Debbie Shively, Martina Harkins, Harry D.

9    Zesch, Rose Lewis, Vincent Thomas Altamura, Rodney Dwayne Crenshaw, Erik Daniel Montoya,

10   and Lynne A. Spencer.  *Id*.  Among the material sought is "information regarding a a .45 Colt

11   Commander semiautomatic pistol and a .22 Caliber Model 102 Ruger rifle pawned during the period

12   October, 1994 through June, 1995."  *Id*.  The claim petitioner asserts to justify this discovery is that

13   his "[t]rial counsel were ineffective in failing to conduct discovery from the pawn shops to determine

14   whether the ring pawned by Mr. Leonard was actually Thomas Williams' ring."  Motion for Leave to

15   Conduct Discovery, p. 34, footnote 13.  Petitioner does not explain how the wide range of discovery

16   sought by means of the proposed subpoena at Exhibit 4.26 might support that claim.  Petitioner has

17   not shown good cause for service of the proposed subpoena at Exhibit 4.26.

18           The Court will therefore deny petitioner leave of court to serve the proposed

19   subpoenas at Exhibits 4.25 and 4.26.

20        C.      Claims Related to Petitioner's Allegation that the Prosecution Failed to
                  Disclose Evidence Regarding Contacts with Deborah Shively

21           Deborah Shively was apparently Cintron's girlfriend at the time of Williams' death.

22   Petitioner alleges the following in his discovery motion:

23

24           Shively ... explained that she was approached in jail by a representative for the
             district attorney's office who wanted her to testify against Mr. Leonard in the
25           Thomas Williams and Tony Antee murder trials.  The Deputy District Attorney
             told her that he could give her favorable consideration on her pending criminal
26           charges if she agreed to testify.  *See* Ex. 1.33, at 2.  However, the deal was
             withdrawn when the individual learned that Shively would express her belief

11

1    that Cintron was responsible for Tony Antee's murder. *Id*. at 2.

2  Motion for Leave to Conduct Discovery, p. 29, lines 15-22. Petitioner claims that "the state failed to

3  disclose evidence of their contacts with Shively at the jail - yet another example of the state's failure

4  to disclose material exculpatory and impeachment evidence." *Id*. at p. 30, lines 6-8.   This claim is

5  not raised in the petition in this action, and there is no indication in the record now before this court

6  that this claim has been raised before the Nevada Supreme Court. *See* Exhibits A and B to Petition.

7  Moreover, petitioner does not point to any proposed subpoena specifically seeking information to

8  support this claim, and the Court finds none.

9         The Court finds that there is not a showing of good cause justifying any discovery

10  relative to this claim, and the Court will therefore deny petitioner leave to conduct discovery relative

11  to it.

12        D.       Claims Related to Petitioner's Allegation that Counsel Failed to Investigate
               <u>and Present Evidence of Erik Daniel Montoya's Involvement in the Offense</u>

13

14        In his discovery motion, petitioner states, in a footnote:

15             The Clark County Public Defender's Office was originally appointed to
        represent Mr. Leonard, but later withdrew based upon a conflict of interest.

16      Apparently, the Clark County Public Defender's Office was also representing
        Erik Daniel Montoya, a potential suspect in the instant case. Petitioner seeks

17      discovery from the Clark County Public Defender's Office as well as from the
        Clark County District Attorney's Office to show that trial counsel was

18      ineffective in failing to investigate and present evidence of Montoya's
        involvement in the offense. *See* Exs. 4.31, 4.32.

19

20  Motion for Leave to Conduct Discovery, p. 5, footnote 3. Here again, this claim is not raised in the

21  habeas petition in this case (docket #7), and, so far as the Court can tell, it has not been presented to

22  the Nevada Supreme Court. *See* Exhibits A and B to Petition.

23         Moreover, petitioner has not shown any justification for the wide-ranging discovery he

24  seeks regarding Montoya. Petitioner essentially requests leave of court to subpoena from the Clark

25  County District Attorney's Office and from the Clark County Public Defender all materials that they

26  have concerning Montoya. *See* Exhibits 4.31 and 4.32. However, all that petitioner has shown this

1  Court regarding Montoya is that the Clark County Public Defender represented him, and that he was

2  "a potential suspect in the instant case." *See* Motion for Leave to Conduct Discovery, p. 5, footnote 3.

3  That does not amount to a showing of good cause for this discovery.

4          The Court will therefore deny petitioner leave of court to serve the proposed subpoenas

5  at Exhibits 4.31 and 4.32.

6          E.      Claims Related to Petitioner's Allegation that Phyllis Fineberg Engaged in
                   Prostitution on the Night of Thomas Williams' Death

7

8          In his discovery motion, petitioner sets forth a claim that his counsel was ineffective

9  for not properly opposing a motion in limine made by the prosecution to exclude evidence that

10 Fineberg had engaged in prostitution on the night of Williams' death, a claim that his counsel was

11 ineffective for not adequately cross-examining Fineberg regarding her prostitution, and a claim that

12 the exclusion of evidence of Fineberg's prostitution deprived him of his right to due process of law

13 and his right to present a defense. *See* Motion for Leave to Conduct Discovery, pp. 52-56.

14         In his petition in this case, petitioner asserts the claim that his federal constitutional

15 rights were violated by the exclusion of evidence of Fineberg's prostitution on the night of the killing.

16 Petition, Ground 11.  There is no indication, however, that petitioner has ever presented any such

17 federal constitutional claim to the Nevada Supreme Court. *See* Exhibits A and B to Petition.

18 Moreover, the vast majority of the discovery that petitioner seeks regarding Fineberg appears

19 unrelated to the claims regarding her alleged prostitution on the night of Williams' death. *See*

20 Exhibits 4.13, 4.16, 4.18, 4.19, 4.20, 4.21, 4.26, 4.33, 4.42, 4.44, 4.45, 4.46, 4.48, 4.53.

21         Petitioner has not shown good cause to conduct discovery with respect to his claims involving

22 Fineberg's alleged prostitution.

23         F.      Discovery Concerning Claims Related to Petitioner's Allegation that the
                   Prosecution Failed to Comply with Its Constitutional Obligation to Disclose
24                 Exculpatory Material Regarding Witnesses Jesus Cintron and Phyllis Fineberg,
                   and that His Counsel was Ineffective in Failing to Adequately Investigate those
25                 Witnesses

26         In his discovery motion petitioner articulates several claims involving information

13

concerning Cintron and Fineberg that might have benefitted him at trial had it been discovered in time:

- a claim that counsel was ineffective for failing to investigate or properly cross-examine Cintron about his receipt of benefits in a pending child support matter (p. 6 of petitioner's motion);

- a claim that counsel was ineffective for failing to investigate or properly cross-examine Cintron about his receipt of cash (pp. 6 and 10-11 of petitioner's motion);

- a claim that counsel was ineffective for failing to properly cross-examine Cintron about his use of aliases (p. 6 of petitioner's motion);

- a claim that counsel was ineffective for failing to properly cross-examine Cintron about his arrest for the offense of providing false information to a police officer (p. 6 of petitioner's motion);

- a claim that counsel was ineffective for failing to impeach Cintron's hearsay statements regarding the murder of Tony Antee (pp. 6-7 of petitioner's motion);

- a claim that the prosecution failed to disclose information regarding Cintron's prosecution for malicious destruction of property (pp. 12-14, 17, and 18-22 of petitioner's motion);

- a claim that the prosecution failed to disclose information regarding Cintron's prosecution for drug possession, annoying a minor, and providing false information to a police officer (pp. 22-24 of petitioner's motion);

- a claim that the prosecution failed to disclose information regarding a forfeiture case against Cintron (pp. 24-25 of petitioner's motion);

- a claim that the prosecution failed to disclose information regarding a child support matter involving Cintron (p. 17 of petitioner's motion);

- a claim that the prosecution failed to disclose information regarding cash payments to Cintron (p. 17 of petitioner's motion);

- a claim that the prosecution failed to disclose information regarding criminal prosecutions of Fineberg (pp. 25-26 of petitioner's motion);

- a claim that the prosecution failed to disclose excessive witness fee payments to Cintron, Fineberg, Frank Deschene, and Thomas Williams, Jr. (pp. 26-27 of petitioner's motion); and

- claims that counsel was ineffective for failing to adequately cross-examine Fineberg regarding her identification of petitioner and her use of aliases (p. 54 of petitioner's motion).

14

1    None of these claims is stated in the habeas corpus petition in this action (docket #7).  Furthermore,

2    there is no indication that any of these claims has ever been presented to the Nevada Supreme Court.

3    *See* Exhibits A and B to Petition.  Every indication is that these claims are unexhausted in state

4    court.  There is, therefore, no showing that this Court could grant relief on any of these claims under

5    28 U.S.C. § 2254(b), and no showing of good cause for discovery to support these claims.

6           In making this determination, the Court is cognizant that petitioner sets forth serious

7    allegations with respect to claims of *Brady* violations, and that petitioner submits evidence

8    purportedly supporting those allegations.  *See*, *e.g.*, Exhibits 1.9, 1.13, 1.14, 1.17, 1.21, 1.23, 1.25,

9    1.27, 1.28, 1.29, 1.30, 1.31, 1.32, and 1.36.  However, if petitioner is to pursue these claims, he will

10   likely have to seek a stay of this action such that he may first present such claims in state court.

11   *See Rhines v. Weber*, __ U.S. __, 125 S.Ct. 1528 (2005).  If petitioner seeks such a stay, and if such a

12   stay is granted, petitioner will have an opportunity to pursue these claims, and to seek to conduct his

13   discovery, in state court.  This Court understands the state courts to be the proper forum for petitioner

14   to seek such discovery in the first instance.  *See* discussion, *supra*, part III.[9]

15          Petitioner asserts that the following of his proposed subpoenas are supported by the

16   claims regarding exculpatory information concerning Cintron and Fineberg:  Exhibits 4.1, 4.2, 4.3,

17   4.4, 4.5, 4.6, 4.7, 4.8, 4.9, 4.10,[10] 4.11, 4.13, 4.16, 4.17, 4.18, 4.19, 4.20, 4.21, 4.22, 4.23, 4.28,[11] 4.29,

18

19   _____

20          [9]  If and when petitioner is able to show that his claims are subject to adjudication on their merits
     in this Court -- that is, after petitioner exhausts the claims, or establishes that exhaustion of them is not

21   required under 28 U.S.C. § 2254(b) -- petitioner may seek leave of court to conduct further discovery
     in this action, if he remains unsatisfied with the discovery afforded him in state court.

22          [10]  The proposed subpoena at Exhibit 4.10 is addressed to the Custodian of Records of the Clark

23   County Coroner-Medical Examiner, and it seeks materials concerning the coroner's investigation of the
     deaths of Thomas Williams and Tony Antee.  Petitioner does not explain what connection this discovery

24   might have to petitioner's claims regarding exculpatory information concerning Cintron and Fineberg.

25          [11]  The proposed subpoena at Exhibit 4.28 is addressed to the Las Vegas Metropolitan Police
     Department, Internal Affairs Department, and it seeks material "relating or referring to the complaint

26   filed by Lori Knight against Detective David Mesinar between November, 1994 and February, 1995."
     Petitioner does not explain what connection this discovery might have to petitioner's claims regarding
     exculpatory information concerning Cintron and Fineberg.

1    4.30, 4.33, 4.34,[12] 4.39, 4.40, 4.43, 4.44, 4.46, 4.47, 4.48, 4.49, 4.50, 4.51, and 4.53.   The Court will

2    deny petitioner leave of court to serve those proposed subpoenas.

3              Petitioner also asserts that service of the proposed subpoena at Exhibits 4.42 and 4.45

4    is supported by the claims regarding exculpatory information concerning Cintron and Fineberg.[13]

5    That proposed subpoena is addressed to the Clerk of the Clark County Justice Court, and it seeks

6    disclosure of materials relative to certain justice court cases involving Cintron and Fineberg.  As is

7    discussed above, it appears that petitioner has not exhausted in state court his claims regarding

8    exculpatory information concerning Cintron and Fineberg, and therefore, the Court denies petitioner's

9    motion with respect to most of the proposed discovery on that subject.  However, with respect to the

10   records of the Clark County Justice Court, petitioner has made a showing that the records may soon

11   be destroyed.  *See* Motion for Leave to Conduct Discovery, p. 32.  With respect to those justice court

12   records, the Court finds that there is good cause for discovery to be conducted now, as part of this

13   proceeding, in order to insure that the records are not destroyed before they may be obtained by

14   petitioner.  The Court will therefore grant petitioner's motion for leave to serve the proposed

15   subpoena at Exhibits 4.42 and 4.45.

16         G.    Discovery Concerning Claims Related to Petitioner's Allegation that there
                 were Improper Contacts Between Phyllis Fineberg and Jurors Outside the
17               Courtroom During the Course of his Trial

18             Next, petitioner describes in his discovery motion several claims that he asserts

19   involving out-of-court contacts that apparently occurred between Phyllis Fineberg, who was a

20   prosecution witness, and certain jurors.  *See* Motion for Leave to Conduct Discovery, pp. 45-58.

21   Petitioner has included such claims in this petition in this action.  *See* Petition, Grounds 3 and 9.

22

23             [12] Petitioner does not specifically assert that the proposed subpoenas at Exhibits 4.34, 4.39, 4.43,
      and 4.44 are justified by the claims regarding exculpatory information concerning Cintron and Fineberg.
24    In fact, those four proposed subpoenas are not specifically cited anywhere in petitioner's discovery
      motion.  However, the Court surmises from the nature of these four proposed subpoenas that petitioner
25    intends for them to be subject to his request for discovery on his claims regarding exculpatory
      information concerning Cintron and Fineberg.  *See* footnote 7, *supra*.
26

             [13]  The proposed subpoenas at Exhibits 4.42 and 4.45 are identical.

16

1  And, it appears that petitioner has litigated such claims in state court.  *See* Exhibits A and B to

2  Petition.

3        Petitioner claims that during breaks in his trial, Fineberg had inappropriate contacts

4  with jurors.  *See* Motion for Leave to Conduct Discovery, pp. 46-49.  The trial court removed two

5  jurors as a result of Fineberg's contacts with them, but petitioner alleges that other jurors may have

6  learned of Fineberg's contacts.  *See id*.

7        Petitioner asserts that one of the removed jurors testified that two alternate jurors were

8  with her when she was contacted by Fineberg.  According to petitioner, the alternate jurors were

9  seated on the jury when the two jurors contacted by Fineberg were removed.

10        Also, petitioner has submitted Exhibit 1.43.  That exhibit consists of two copies of

11  page 1 of what appears to be a declaration of a juror not removed from the jury.  The unsigned portion

12  of the declaration submitted as Exhibit 1.43 indicates that juror learned of the Fineberg's contacts,

13  either from one of the removed jurors or from another juror.

14        Petitioner seeks leave of court  to serve subpoenas on 12 jurors (Exhibits 4.54 - 4.65),

15  ordering their depositions and ordering them to produce documents relative to petitioner's trial.  It has

16  been eight years since petitioner's trial.  Without losing sight of the fact that petitioner is on death

17  row, and that this case presents weighty issues, it must be recognized that subpoenas addressed to

18  jurors, so long after their service, would submit them to significant burden and intrusion.  The Court

19  is not inclined to grant leave of court for such discovery absent a showing of good cause particular to

20  each juror, and absent a showing that petitioner sought such discovery diligently and in good faith in

21  his state-court habeas corpus litigation.

22        In his state habeas action, petitioner apparently presented a claim that his trial counsel

23  was ineffective for not adequately investigating Fineberg's inappropriate contacts with jurors.  *See*

24  Exhibit B to Petition.  However, petitioner has not described what discovery he did, or at least sought

25  to do, with respect to the jurors, in the context of that state-court action.

26        The Court will reserve its ruling on the issue of petitioner's proposed subpoenas

17

1   addressed to the jurors (Exhibits 4.54 - 4.65), and will schedule a hearing at which petitioner may

2   present further argument regarding this matter.

3        H.    Discovery Concerning Claims Related to Petitioner's Allegation that His
               Counsel Failed to Adequately Investigate His Background and Present
4              Mitigating Evidence at the Penalty Phase of His Trial

5              The last set of claims on which petitioner seeks discovery involves allegations that his

6   counsel failed to adequately investigate his background and present mitigating evidence at the penalty

7   phase of his trial.  *See* Motion for Leave to Conduct Discovery, pp. 58-60.  It appears that in his state

8   habeas proceedings, petitioner presented such a claim:  that his counsel was ineffective for failing to

9   investigate his background.  *See* Exhibit B to Petition.  The Court finds that petitioner has shown

10  good cause to conduct discovery regarding this subject matter.

11             In this regard, petitioner points to the proposed subpoenas found at the following

12  exhibits as those he wishes to serve:  Exhibit 4.12 (addressed to the Riverside, California, Police

13  Department, seeking materials concerning petitioner); Exhibit 4.24 (addressed to the Custodian of

14  Records, Medical Records Department, Clark County Detention Center, seeking materials concerning

15  petitioner); Exhibit 4.35 (addressed to the Chicago Police Department, seeking materials concerning

16  petitioner); Exhibit 4.36 (addressed to the Clerk of the Circuit Court, Cook County, Illinois, Archives

17  Department, seeking materials concerning petitioner); and Exhibit 4.37 (addressed to the Clerk of the

18  Nineteenth Judicial Circuit Court, in Waukegan, Illinois, seeking materials concerning petitioner).

19  The Court will grant petitioner leave to serve those subpoenas.

20             Petitioner also points to the proposed subpoena at Exhibit 4.27.  That is apparently

21  supposed to be a subpoena addressed to the Custodian of Records of the Merrillville, Indiana, Police

22  Department, seeking information regarding petitioner.  *See* Index of Exhibits (docket #34); *also*,

23  *compare* Exhibit 4.37.  Exhibit 4.27 includes an incorrect first page of the subpoena.  The Court will

24  grant petitioner leave to serve the proposed subpoena at Exhibit 4.27, so long as it is first edited to

25  include a correct first page, addressing the subpoena to the Custodian of Records of the Merrillville,

26  Indiana, Police Department.

1    In addition, the Court observes that there is a proposed subpoena that is not mentioned

2 in petitioner's motion and that seeks information concerning petitioner's background:  Exhibit 4.38

3 (addressed to the Custodian of Records of the Crystal Palace, in East Chicago, Indiana, seeking

4 employment and personnel records concerning petitioner).  The Court finds that proposed subpoena to

5 be subject to petitioner's good-cause showing with respect to claims regarding his counsel's alleged

6 failure to adequately investigate his background and present mitigating evidence at the penalty phase

7 of his trial, and that there is good cause for its service.   The Court will grant petitioner leave to serve

8 the proposed subpoena found at Exhibit 4.38.[14]

9    With respect to his claims that his counsel failed to adequately investigate his

10 background and present mitigating evidence at the penalty phase of his trial, petitioner seeks to serve

11 the proposed subpoena found at Exhibit 4.52, which seeks a deposition of, and production of

12 documents by, Joyce Funchess, petitioner's mother.  Petitioner informs the Court, and submits

13 evidence, that Ms. Funchess suffers from serious health problems.  *See* Exhibit 1.45.  Petitioner

14 wishes to conduct a video deposition of Ms. Funchess to preserve her testimony.  The Court will grant

15 petitioner leave to serve the proposed subpoena found at Exhibit 4.52, and to conduct a video

16 deposition of Ms. Funchess.

17    I.    Exhibit 4.41

18    The proposed subpoena at Exhibit 4.41 is not mentioned anywhere in petitioner's

19 motion, and does not appear to the Court to fall within any of the eight categories of proposed

20 discovery discussed above.[15]  That proposed subpoena is addressed to the Custodian

21 of Records of the Shelter Island Apartments, in Las Vegas, and it seeks materials concerning

22 Tony Antee's tenancy at those apartments from January 1993 through June 1994.  Petitioner has not

23 shown good cause for such discovery, and it will be denied.

24    J.    Exhibit 4.66

25 _____

26    [14]  *See* footnote 7, *supra*.

      [15]  *See* footnote 7, *supra*.

1	The proposed subpoena at Exhibit 4.66 is not specifically mentioned anywhere in
2	petitioner's motion.[16]   That proposed subpoena would order a deposition of, and production of
3	documents by, Phyllis Fineberg.  It does not set forth the subject matter to be covered in the
4	deposition that petitioner envisions.  With respect to the production of documents ordered by the
5	subpoena, it calls for:  "Any and all documents relating to the capital murder trial of Gregory Leonard
6	in August 1997, in which you appeared as a witness."  *See* Exhibit 4.66, Attachment A.  Petitioner has
7	not provided justification for the broad discovery sought by the proposed subpoena at Exhibit 4.66.
8	The Court will, therefore, deny petitioner leave of court to serve that proposed subpoena.

9	        **IT IS THEREFORE ORDERED** that petitioner's Motion for Leave to Conduct
10	Discovery (docket #29) is **GRANTED IN PART AND DENIED IN PART**.

11	        **IT IS FURTHER ORDERED**  that petitioner is granted leave of court to serve the
12	subpoenas found at Exhibits 4.12, 4.24, 4.35, 4.36, 4.37, 4.38, 4.42, 4.45, and 4.52.

13	        **IT IS FURTHER ORDERED** that petitioner is granted leave of court to serve the
14	subpoena found at Exhibit 4.27, so long as that subpoena is edited, before it is served, to include a
15	correct first page, addressing the subpoena to the Custodian of Records of the Merrillville, Indiana,
16	Police Department.

17	        **IT IS FURTHER ORDERED** that the Court will entertain further argument with
18	respect to petitioner's proposed subpoenas found at  Exhibits 4.54, 4.55, 4.56, 4.57, 4.58, 4.59, 4.60,
19	4.61, 4.62, 4.63, 4.64, and 4.65.   The Court will hold a telephonic hearing concerning  those
20	proposed subpoenas, as discussed above, on **February 17, 2006, at 9:00 a.m.**  Counsel shall be
21	available at that time at their respective telephone numbers.  If counsel wish to make other
22	arrangements regarding their telephonic appearance at that hearing, or if counsel wish to appear in
23	person, counsel shall contact Rosemarie Miller, at 775-686-5829, in advance of the hearing.

24	        **IT IS FURTHER ORDERED** that, in all other respects, petitioner's Motion for
25	Leave to Conduct Discovery is denied.

26	

        [16]  *See* footnote 7, *supra*.

1        **IT IS FURTHER ORDERED** that the Court will set a schedule for the completion of

2 discovery and amendment of petitioner's habeas corpus petition when the remaining issues regarding

3 the proposed subpoenas at Exhibits 4.54, 4.55, 4.56, 4.57, 4.58, 4.59, 4.60, 4.61, 4.62, 4.63, 4.64, and

4 4.65 are resolved.

5        Dated this 24th day of January, 2006.

6

7

8                   _____

9                   LARRY R. HICKS
                    UNITED STATES DISTRICT JUDGE

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26